IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHIRLEY RUMPH,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        CASE NO. 2:23-CV-06-KFP
                                        )
WEXFORD HEALTH SOURCES, INC.,           )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Shirley Rumph filed this action against Defendant Wexford Health Sources, Inc., after it terminated her employment as a registered nurse in August 2022. She alleges federal claims of race discrimination in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count II) and a state law claim of defamation (Count IV).[1]

Before the Court is Wexford's Motion for Summary Judgment (Doc. 28) and Rumph's Motion to Strike Evidentiary Material (Doc. 26). Upon consideration of these motions, along with the parties' responses and replies and the applicable case law, it is ORDERED that Wexford's Motion for Summary Judgment is GRANTED and Rumph's Motion to Strike Evidentiary Materials is DENIED, as set forth below.

---

[1] Count III, labeled "Mental Suffering and Emotional Distress," describes Rumph's alleged damages of mental suffering and emotional distress but does not set forth the elements of a specific cause of action. Therefore, the Court will disregard it in determining whether Rumph's claims survive summary judgment.

## I.     SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

## II.     UNDISPUTED FACTS

Rumph, an African American female, began working for Wexford as a registered nurse in April 2018. Wexford held the contract with the Alabama Department of Corrections (ADOC) to provide health care and mental health care services to state incarcerated inmates. On August 6, 2022, Arnaldo Mercado, director of ADOC law enforcement services, sent an email to Wendy Williams and Deborah Crook, deputy commissioners of ADOC, about a Department of Justice complaint concerning allegations of physical assault and abuse against inmates by Rumph. Doc. 29-8 at 81. The email stated as follows:

> Please see attached video. This is a case that Agent Loria and Rosamond started working this past Thursday. The case stems from a DOJ complaint where an allegation of extortion was made. Agent Rosamond was assigned the Extortion Investigation. While conducting interviews, allegations of civil rights violations were made pertaining to a nurse and [an] inmate [who] was allegedly pushed off the bed or fell off the bed and then assaulted by nurse "Rump" sometime in January 2022. We believe the actual name of the nurse is Shirly Rumph. Rumph has allegedly beaten several elderly inmates both past and present. During this investigation, agents learned there was possible video footage in the possession of two civilians and an investigator at the DOJ civil litigation department.
>
> .  .  .
>
> Agent Loria spoke with Warden Headley today. He received a complaint from another inmate . . . and forwarded the complaint to LESD. He also transferred [the inmate] to Kilby shortly after the recorded complaint. Headley has not received or seen this video.
>
> Loria is forwarding the video to Headley so he can try and confirm that it is in fact Nurse Rumph.

*Id*.

That same day, August 6, Warden Headley was informed of the video referenced in the above email correspondence. *Id*.; Doc. 29 ¶ 4; Doc. 38 ¶ 4; Doc. 29-3. Rumph testified that Tiffanye Hill, Wexford's acting health services administrator at the time, called her on August 6 to advise that Warden Headley said she could not return to work until he completed an investigation into the abuse allegations. Doc. 1 ¶ 16; Doc. 29-11 at 9, 55. Warden Headley had authority to determine what third parties had access to Ventress Correctional Facility. He issued a lock-out order on August 8 barring Rumph from entering Ventress "effective immediately and until further notice." Doc. 29-4. Headley testified that the "reason that [he] barred Ms. Rumph from entering Ventress Correctional Facility was due to what [he] witnessed on the video." Doc. 29-3 at 2.

Section 6.14 of Wexford's Employee Handbook states as follows:

> To ensure your safety and security, you are required to comply at all times with all security, administrative and institutional directives from correctional facilities staff. Every correctional facility has the right to restrict your access or require your immediate removal from the facility without prior notification**. If your clearance into the facility is revoked for any reason, your employment with Wexford Health may be terminated as a result of being unavailable for work due to your inability to access the worksite.**

Doc. 29-9 at 83 (emphasis added). Rumph testified that she had read this policy and does not dispute that she was aware of it. Doc. 29-11 at 14 (Pl. Dep. at 55:20–56:14); Doc. 29 ¶ 11; Doc. 38 ¶ 9.

Ken Dover, Wexford's vice president of operations, was responsible for the ADOC contract at the time of the underlying events. Doc. 29 ¶ 12; Doc. 38 ¶ 12. Dover testified that he received an email with an attached video from Ms. Crook at ADOC on

August 8. Doc. 29-9 at 9 (Dover Dep. at 34:4–19). He forwarded that email to other

Wexford staff members the same day and stated as follows:

> Below is very disturbing information regarding one of our nurses. The nurse
> has been locked out of the facilities. We will complete termination in the
> morning. The video was taken, I am told, by an inmate. We have had no prior
> complaints of patient abuse at this, or any other facility.

Doc. 29-9 at 87. Dover testified as follows regarding Rumph's termination:

> When one loses their security clearance, they cannot go into the facility and
> perform their duties. So therefore, by losing a security clearance, they have
> no way to perform their duties and it's a termination. It's outlined in the
> employee handbook. It's happened time and time again. We have no recourse
> with the ADOC. It is totally their decision who comes into and out of their
> facilities. They even, on one occasion, denied OSHA entrance into their
> facilities because of security issues. There's – it's completely out of our
> hands.

*Id*. at 11 (Dover Dep. at 44:10–23). He further explained that, when an employee loses

their security clearance with the ADOC, Wexford has no recourse. *Id*. at 12 (Dover Dep.

at 45:14–16). He said "ultimately it's within HR" to make the decision to terminate, but

"[t]here's no consultation. You lose your security clearance, you can't work." *Id*. (Dover

Dep. at 47:7–19).

On August 17, 2022, Wexford's human resources director sent a letter to Rumph

memorializing an August 16 conversation between Rumph and Wexford's human

resources specialist for Alabama. Doc. 29-11 at 49. The letter stated that Wexford and

ADOC received evidence of an ongoing investigation of abuse on August 6 and that

Warden Headley revoked Rumph's clearance on August 8. *Id*. As a result, Wexford was

terminating her employment effective Saturday, August 6, 2022. *Id*.

Rumph does not dispute the above facts. Her dispute in this case pertains to the characterization of what the video in question shows, arguing that she never abused an inmate and there is no proof she did.[2]

At the beginning of the video, Rumph can be seen lying crossways on her belly on top of a bed with an inmate lying beneath her. *See* Doc. 37-1. The inmate's feet and ankles can be seen protruding from under Rumph's body. Rumph is shown from behind, so her face and the front of her body are not visible. The inmate is partially on and partially off the bed, and no part of his body is visible except his feet and ankles, as Rumph's body blocks any view of the rest of him. Because of Rumph's position on the bed, the viewer cannot see Rumph make contact with the inmate, but the audio is unmistakable. Rumph strikes the inmate, and it is clearly audible. She strikes him and tells him to "get up," and she does it again before the video ends. There is no indication the inmate is speaking, fighting back, or even moving. Indeed, it does not appear that he could move, given Rumph's position on top of him.

In a letter sent to the ADOC Commissioner after her termination, Rumph described the event by saying three ADOC officers were present and "handled the situation" and that she had been attacked and could have been injured or killed due to lack of adequate ADOC staffing. Doc. 29-11 at 6. In her Complaint, she alleges the inmate in the video was high on methamphetamines. Doc. 1 ¶ 17. When questioned about the incident in her

---

[2] Whether the action shown in the video is "abuse," as Headley determined, is not a determination necessary for the Court to resolve on summary judgment. As discussed below, Headley's characterization need not be correct to be nondiscriminatory.

deposition, Rumph was asked which inmate's bed she was lying on, and she responded, "I wasn't laying on no bed. I'm trying to save a patient's life." Doc. 29-11 at 25 (Pl. Dep. at 100:14–101: 8). In another part of her deposition, she mentioned three ADOC officers who were working in the healthcare unit that day and testified that the inmate "was dead practically," the officers took him to the ER "to continue to be worked on, and they saw him kicking and beating me up." *Id*. at 13 (Pl. Dep. 50:19–51:2). None of this is shown on the video. When asked to describe the incident on the video, she pleaded her Fifth Amendment right against self-incrimination. *Id*. (Pl. Dep. at 8:2–19, 9:19–22, 10:10–15, 45:9–12, 46:2–17, 48:3–16, 52:12–54:1, 101:4–102:5).

Following Rumph's termination, she filed a timely EEOC charge. The charge asserted that she was discriminated against because of her race, she was accused of hitting an inmate in early August 2022, Wexford conducted an investigation, she denied the allegations, she received a letter on August 10 notifying her of the discharge, and she was discriminated against in violation of Title VII. Doc. 1-1 at 1.

After receiving a right-to-sue letter, Rumph filed the instant lawsuit alleging she was terminated after complaining of race discrimination and retaliation by her former supervisor, Cindy Johnson. Doc. 1 at 2–4; Doc. 38 at 6. According to Rumph, Johnson treated her less favorably than a white registered nurse named Jessica George, and Johnson "constantly harassed" Rumph and created a "hostile work environment." Doc.

1 at 3. Rumph said Johnson would write her up for various job offenses but would not write up the white nurses.[3] *Id.*

Rumph went on to testify that Jessica George made a derogatory remark to her on one occasion in June 2022 but was not disciplined.[4] Rumph reported it to the regional manager, Celeste Hunter, who is African American. Doc. 29-11 at 27–29 (Pl. Dep. at 108:16–112:10, 116:12–19). After this, Rumph believes Cindy Johnson colluded with Warden Headley to increase the harassment and "nit-pick" her job performance. Doc. 1 ¶ 13. According to Rumph, Warden Headley "profiled" her by "watching [her] and no other RN or other nurse." *Id.* at 4–5 (Pl. Dep. at 14:2–17:21). Her belief that Warden Headley conspired with Johnson is based solely on the fact that Headley "would constantly go into the office and talk to Ms. Johnson every time he come in and watch me perform my duties on patients whereas he didn't do it with the white nurses was there." Doc. 29-11 at 25 (Pl. Dep. at 98:18–99:16).

Finally, Rumph alleges that Johnson openly belittled her in July 2022 for the way she had treated a white inmate and that, after this, Wexford "ramped up" its discrimination with the biased, pretextual investigation into allegations of abuse. Doc. 1

---

[3] The only write-up in Rumph's personnel file was a 2018 write-up by the health services administrator who preceded Cindy Johnson. Doc. 29-11 at 18. Rumph testified that she was never counseled about that particular write-up and did not recall it. *Id.* at 18–19. When it was pointed out that Rumph's personnel file contained no other write-ups, Rumph testified that Johnson "counseled" her about documenting paperwork charts, the way she talked to inmates, and other things but did not counsel white nurses for the same conduct. *Id.* at 19–20 (Pl. Dep. at 73:6–80:20).

[4] The Complaint alleges that Ms. George referred to Rumph and three other African American nurses as "lazy black mother f-----s." Doc. 1 ¶ 111. However, when testifying in her deposition, Rumph repeated the insult *seven* times and testified each time that George said only "lazy mother f-----s." Doc. 29-11 (Pl.'s Dep. at 78:7–10, 79:9–11, 95:1–3; 97:3–6; 117:13–14; 127:2–3; 129:13–15.) Thus, according to Rumph's deposition testimony, George never used the word "black" when referring to Rumph and the other nurses.

¶ 15. As mentioned above, Rumph maintains that she complained about Johnson to Celeste Hunter, regional director, before her termination. Doc. 29-11 at 27–28 (Pl. Dep. at 108:16–109:17). Rumph testified that Hunter told her to report George for the derogatory comment, but Rumph "didn't get a chance to get the paper because Ms. Johnson made sure [she] was out of there." *Id*. at 30 (Pl. Dep. at 117:8–16).

None of Rumph's allegations about George's derogatory remark, being treated differently than white nurses, reporting Johnson's racial discrimination to Hunter, suffering retaliation because of that report, or experiencing a hostile work environment are mentioned in her EEOC charge. Thus, the Complaint contains only counts for disparate treatment under Title VII and § 1981 and a state law defamation claim.

## III.    DISCUSSION

### A.    Race Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1); *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943–44 (11th Cir. 2023). Likewise, 42 U.S.C. § 1981 prohibits employers from intentionally discriminating on the basis of race in employment contracts. *Tynes*, 88 F.4th at 943 (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) and *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999)). To prove a claim under either statute, a plaintiff can use direct evidence, circumstantial evidence, or both. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022).

### (1)     Direct Evidence

"Direct evidence of discrimination is evidence that, if believed, proves the existence of a fact without inference or presumption." *Addison v. Ingles Markets, Inc.*, 515 F. App'x 840, 842 (11th Cir. 2013) (citing *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010)). "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (quotation omitted). Accordingly, "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998). The evidence must reflect a "discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 641 (11th Cir. 1998) (internal quotation marks omitted)).

Rumph argues her own testimony is direct evidence of the alleged discrimination. In her brief, Rumph asserts that Wexford "wants the Court to ignore the testimony of Ms. Rumph as not being direct evidence, which would violate Eleventh Circuit law." Doc. 39 at 23. She further states as follows:

> Rumph offered direct evidence of her racial discrimination claims in her deposition testimony, as well as documentation of conflicting statements and evidence presented by Wexford. This direct evidence presents issues of material facts that a jury must decide and would be in inappropriate for dismissal at the summary judgment stage.

*Id.* But her brief does not identify specific deposition testimony, documentation of conflicting statements, or even a citation to the record.[5] To the extent Rumph intends to rely on her testimony above, where she describes how Johnson treated Caucasian nurses differently, that testimony is not direct evidence that Rumph was terminated because of her race.

Other than Rumph's speculation that Cindy Johnson colluded with Warden Headley because he went in her office to talk, there is nothing in the record suggesting that Johnson had any role in the decision to terminate Rumph. The record shows Headley received the video in question and issued a lockout notice, the notice was sent to Wexford, and Ken Dover then informed other Wexford staff members of the video with a note saying, "We will complete termination in the morning." Thus, Rumph has presented no evidence connecting Johnson to the termination decision, and Johnson's treatment of Rumph cannot be direct evidence of someone else's motivation for particular conduct.

Even if Johnson had been involved in the termination decision, there is no evidence of a "blatant remark" by Johnson about the decision-making process. The oft-quoted example of direct evidence is "a management memorandum saying, 'Fire Earley—he is too old.'" *Damon*, 196 F.3d at 1359 (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990) (citations and quotations omitted)); *see Merritt v. Dillard Paper*

---

[5] Rumph's cursory mention of this issue is insufficient for the Court to consider the argument, and it may be deemed waived. *United States v. ADT Sec. Servs., Inc.*, 522 F. App'x 480, 488 (11th Cir. 2013); *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1297 n.3 (11th Cir. 2009) (cursory briefing of argument deemed waived); *Rowe v. Schreiber*, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998) (acknowledging issue in briefing without argument deemed abandoned). Nonetheless, the Court will explain why there is an absence of direct evidence in this case.

*Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (explaining that evidence merely suggesting discrimination or evidence that is subject to more than one interpretation is not direct evidence). No evidence presented by Rumph even comes close. There are no statements or "blatant remarks" attributable to anyone at Wexford whose intent could mean nothing other than race discrimination with respect to the decision-making process. Accordingly, Rumph has not presented direct evidence of discrimination.

### (2)     Circumstantial Evidence

When a plaintiff does not present direct evidence, her circumstantial evidence is often analyzed under the *McDonnell Douglas* framework, which requires a plaintiff asserting a race discrimination claim under Title VII or § 1981 to show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly-situated employees outside her class more favorably. *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1336 (11th Cir. 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) ("*Lewis I*") (en banc) (additional citation omitted)). If a plaintiff makes out a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id*. (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Lewis I*, 918 F.3d at 1221)). If at summary judgment an employer articulates a non-discriminatory reason for its actions, "'to avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" *Id*. (quoting *Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1228 (11th

Cir. 1993)). The employer's reason is not pretext "'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Id*. (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original)).

Here, the Court need not address whether Rumph has established a prima facie case because, assuming she has, Wexford has articulated a legitimate, non-discriminatory reason for her termination. This places the burden on Rumph to show Wexford's reason is false and that discrimination was the real reason. Where "'the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is *no longer relevant*' . . . because the 'district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff.'" *Tynes*, 88 F.4th at 945 (discussing role of *McDonnell Douglas* burden-shifting framework at summary judgment stage) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (emphasis in original)).

Rumph cannot prevail in the face of Wexford's articulated reason for her termination because she cannot prove the reason for her termination (that Warden Headley barred her from her worksite because he believed the video showed abuse) is false. First, the entirety of Rumph's argument on pretext is as follows:

> Defendant's argument here fails as previously argued herein above and now below. Wexford did not have legitimate, non-discriminatory reasons for terminating Rumph other than the conflicting pretextual reasons put forth only after Rumph complained of racial discrimination. (See Exh. 11).

Doc. 38 at 24. The referenced exhibit is an eight-page excerpt from Rumph's deposition where she testifies about Headley's "profiling," how Johnson never disciplined Jessica

George, and how she never heard of a video or was the subject of complaints until she complained of Johnson's conduct to Celeste Hunter. There are no citations to the specific lines of testimony that Rumph believes are applicable, no attempt to apply the law to the facts, and no argument explaining or attempting to persuade the Court that Rumph has demonstrated pretext.[6]

Second, the undisputed facts establish that Wexford's reason for termination was not false. Rumph does not dispute that Warden Headley learned about the video of Rumph's alleged abuse from ADOC officials, who learned about it as the result of a DOJ investigation. There is no contention that anyone at Wexford played a role in sending the video to ADOC or Warden Headley. After Headley received the video, Tiffanye Hill called Rumph on August 6 and told her Warden Headley said not to return to work. After viewing the video, Headley issued a lockout notice barring Rumph from Ventress. That notice was sent to Ken Dover at Wexford, which, consistent with its policy regarding employees who lose clearance and cannot access their worksite facility, terminated Rumph. Rumph denies that she ever abused an inmate, *but she does not deny that Warden Headley issued the lockout notice barring her from her job site*.[7] An employer's articulated reason is

---

[6] As with the direct evidence argument, Rumph's brief statements about pretext are so insufficient that the argument is deemed waived, but the Court will explain how the undisputed facts prevent Rumph from establishing pretext.

[7] Moreover, an employer who fires an employee under a mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (citing *Damon,* 196 F.3d at 1363 n.3) (additional citation omitted)). Thus, if Rumph could establish that she did not abuse the inmate on the video, Wexford would be entitled to rely on a good faith belief that she committed abuse and that Warden Headley issued the lockout order based on that abuse. *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that inquiry is not whether employee was guilty of misconduct but whether employer in good faith believed employee had done wrong and whether this belief was reason for termination). Here, Rumph has presented

not pretext for discrimination unless it is shown to be false, *St. Mary's Honor Ctr.*, 509 U.S. at 515, and Rumph cannot make that showing here. Thus, her race discrimination claims fail under the *McDonnell Douglas* analysis.

### (3)   Convincing Mosaic

A plaintiff who cannot meet the *McDonnell Douglas* requirements "may still be able to prove her case with a convincing mosaic of circumstantial evidence that would allow a reasonable jury to infer or find intentional racial discrimination in an adverse employment action."[8] *Poer*, 100 F.4th at 1336–37 (citing *Tynes*, 88 F.4th at 946; *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."); *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023) ("[T]he convincing mosaic metaphor offers an alternative to plaintiffs unable to succeed through the *McDonnell Douglas* framework.") (additional citation omitted)). Therefore, a plaintiff whose claim fails under *McDonnell Douglas* may still prevail by introducing evidence that as a whole "strongly suggests [her employer's] decisions were based on race." *Id.* (citing *Smith*, 644 F.3d at 1328). A plaintiff may do this

---

no evidence touching on Wexford's good faith belief with respect to the lockout notice or abuse allegations.

[8] In his concurrence in *Tynes*, 88 F.4th at 951, Judge Newsome described the convincing-mosaic standard as "basically just Rule 56 in operation. Quite unlike *McDonnell Douglas*, it actually asks the key question: Does the 'record, viewed in a light most favorable to the plaintiff, present[ ] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker'? Strip away the grandiloquence—after all, 'convincing mosaic of circumstantial evidence' just means 'evidence'—and that is *exactly* Rule 56's summary-judgment standard.'" (Internal citation omitted.)

with evidence of suspicious timing, ambiguous statements, and other evidence giving rise to an inference of discriminatory intent; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's reason is pretextual. *Id*. (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*) (internal quotation marks and citation omitted)). Rumph contends she has presented a convincing mosaic of discrimination by producing evidence of "suspiciously preferential treatment of non-black employees" by Cindy Johnson and "proof of inconsistent statements or shifting explanations for the adverse employment decision." Doc. 38 at 19. As explained below, the Court disagrees.

### (a)      Preferential Treatment of Other Employees

Rumph bases her argument about Johnson's "suspiciously preferential treatment of non-black employees" on the assertion that Johnson "did not discipline, counsel, or reprimand other nonwhite RNs for the same actions . . . ." She cites to eight pages of her deposition testimony where she testified that Johnson "was always calling [her] out on something" but did nothing about two white nurses who did not do their jobs. Doc. 38-9 at 2. She testified that one of the white nurses, Jessica George, "would leave work without giving a report" and that Rumph had to "sometimes . . . go in in the afternoon time and give [medication] to the patient because they were complaining." Finally, she stated that two white nurses would write orders for patients, but Johnson would question Rumph when she wrote orders. *Id*. at 2–3.

As mentioned above, nothing in the record suggests that Johnson played a role in ADOC's receipt of the video in question, Headley's receipt of the video, the issuance of

the lockout order, or Ken Dover's email to staff stating Wexford would begin terminating Rumph the next day. Thus, there is no inference that can be drawn from Johnson's alleged conduct that relates to Rumph's termination.

Additionally, a plaintiff does not survive summary judgment by showing "suspiciously preferential treatment." She must show systematically better treatment of similarly situated employees, and comparators must be "similarly situated in all material respects." *Lewis II,* 918 F.3d at 1218. Rumph's reported preferential treatment involves different treatment with respect to the performance of day-to-day nursing duties, but Rumph has presented no evidence of an employee who committed misconduct as serious as abuse of an inmate. Because Rumph cannot prove that other employees engaged in a similar degree of misconduct, she lacks evidence of better treatment of similarly situated employees. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1312 (11th Cir. 2023) (where plaintiff had multiple reports of unprofessional, threatening, intimidating, and abusive behavior, finding plaintiff's evidence failed because the degree of misconduct was not the same—one comparator yelled at plaintiff in front of other employees and the other "exhibited bullying behaviors" toward colleagues for a period of time).

### (b)    Inconsistent Statements and Shifting Explanations

To support her argument that Wexford's "inconsistent statements or shifting explanations" create a convincing mosaic of circumstantial evidence of discrimination, Rumph first asserts there is no proof showing she abused an inmate. She points to the deposition testimony of Cindy Johnson and Tiffanye Hill to demonstrate this lack of proof. Doc. 38 at 9, ¶ 3. In the cited testimony, Johnson states she has no proof that

Rumph beat elderly inmates in the past or present and has not seen any other videos of Rumph doing anything abusive to inmates. Hill testified she did not know if the investigation against Rumph was completed and that she had not seen any information related to the investigation since August 10, 2022. The obvious problem with Rumph's argument is that this testimony fails to contradict the video or create a factual dispute as to the events in the video. Johnson may not have proof of Rumph's abuse. Hill may not have seen anything related to the investigation. But these facts have nothing to do with what Headley reviewed on the video and used to make his decision to lockout based on abuse.[9]

Rumph places much emphasis on her August 6 termination date in arguing that certain inconsistencies establish racial discrimination. In her deposition, she repeatedly insisted that the August 8 lockout could not have been the basis of her termination because she was terminated two days earlier on August 6:

> No one talked to me. They sent the letter saying as of August 6th you have been terminated on the same time that I'm being told that there was an investigation.

Doc. 29-11 at 17 (Pl. Dep. at 68:18–21).

---

[9] Despite her denials regarding abuse, Rumph fails to offer a plausible explanation that the video shows anything but physical abuse. She has offered bits and pieces of a possible explanation, but, when asked to describe the incident, she consistently invoked her Fifth Amendment right against self-incrimination. Unlike in criminal cases, when a civil litigant does this, the trier or fact may draw adverse inferences from the invocation of the party's Fifth Amendment right. *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1310 (11th Cir. 2014) (noting that in civil cases "the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify in response to probative evidence offered against them") In this case, even without drawing an adverse inference from Rumph's invocation of the Fifth Amendment, her evidence fails to create a convincing mosaic of circumstantial evidence that her termination was based on race.

> All I know is the letter that Wexford Health Sources sent to me said as of
> August the 6th I was terminated. He didn't tell me personally. They wrote it
> in a letter.

*Id*. at 18 (Pl. Dep. at 69:10–14).

> I've answered this question. You want me to keep answering this question.
> Warden Headley revoked my clearance after Wexford Healthcare, along with
> Cindy Johnson, fired me.

*Id*. at 25 (Pl. Dep. at 99:12–16). This argument is unavailing. Contrary to what Rumph

would have the Court believe, nothing about the timeline leading up to her termination

suggests Wexford terminated Rumph before she was barred from her worksite. The fact

that Warden Headley issued the lockout notice on August 8 but Rumph's termination

was made effective August 6, as stated in the August 17 termination letter (Doc. 29-11

at 49), is not evidence of inconsistent statements or shifting explanations.

Rumph similarly attempts to discredit Wexford's stated reason for her termination

by arguing that Wexford claims the abuse occurred on August 4, 2022, but documents

produced by Wexford state it happened in January 2022. Doc. 38-5 at 3–4. Rumph cites

two documents to support this argument. The first is a computer printout titled

"Separation Information," submitted in connection with Rumph's application for

unemployment compensation benefits. Doc. 29-1. It lists the date of the "final incident"

as August 4, 2022. *Id*.; s*ee also* Doc. 29-1 at 2–5. The second document is a "Statement

of Events" prepared by Cindy Johnson on July 20, 2022. This statement documents an

inmate's report that Rumph had abused two inmates (including the inmate in the video)

on December 30 or 31, 2021, and it further describes the events in the video as occurring

on January 1, 2022. Doc. 38-5 at 3.

This argument by Rumph fails because the date of the incident is immaterial, so any inconsistency about the date has no probative value regarding her termination. Headley issued the lockout order the first business day after learning about the video, and Wexford began the process of terminating Rumph immediately upon learning of the video and the lockout order. No evidence suggests the date of the incident was a factor in Rumph's termination. Additionally, if the date were material, Johnson's statement is merely a documentation of details relayed to her *by an inmate*, not a statement by Wexford concerning the facts of Rumph's termination. Accordingly, these "inconsistencies" about the date of the alleged abuse fail to create any inference that Rumph's termination was based on discrimination.

Finally, Rumph asserts that Wexford's failure to follow its progressive discipline policy is proof of discriminatory intent. Doc. 38 at 11. Although Wexford had a progressive discipline policy in place, it also had a policy stating an employee whose clearance was revoked by ADOC for any reason may be terminated as a result of losing access to the worksite. Rumph was aware of this policy. Ken Dover, Wexford's corporate representative, testified that Wexford has no recourse when ADOC revokes an employee's security clearance, that termination is automatic, and that he could not recall an instance where an employee lost security clearance but was not terminated. Rumph has put forth no evidence disputing this evidence or otherwise suggesting that Wexford's progressive discipline policy should have come into play under the circumstances of this case. Thus, Wexford's failure to follow the progressive discipline policy, when it had another policy that applied specifically to Rumph's conduct, raises no inference of discrimination.

For these reasons, the Court finds Rumph's evidence fails to create a convincing mosaic of circumstantial evidence that raises a genuine issue of material fact, and Wexford is entitled to summary judgment on her race discrimination claims.

**B.      Defamation**

In Alabama, the elements of defamation are (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting to at least negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *Flickinger v. King*, No. SC-2022-0721, 2023 WL 3029709, at *5 (Ala. Apr. 21, 2023) (citing *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 186 (Ala. 2016) (citations omitted)).

In her Complaint, Rumph alleges Wexford "reported Plaintiff to the Alabama Board of Nursing for the incident which supposedly happened in February 2022" and that "these false inmate abuse allegations" constitute defamation of character. In her summary judgment response, she asserts that the "defendant sent a letter to the Department of Public Health's Nursing Board with intentional malice concluded a finding of abuse and extortion, knowing the investigation was ongoing and not final." Doc. 38 at 25–26. Rumph does not identify who made the report to the nursing board, who sent a letter to the nursing board, or the contents of either. And the only record citation is to Johnson's statement documenting an inmate's report of abuse. The only other "briefing" by Rumph is a recitation of the elements of defamation and the following conclusion:

> [A]s stated in the Complaint, the Defendant made, published, and communicated allegations that involved indictable offenses of extortion and patient abuse, none of which have been proven to be fact by the defendant or other party, with knowledge and reckless disregard for the truth. The defendant wrote a letter to the Alabama Nursing Board intentionally to falsely conclude Ms. Rumph abused inmates and extorted inmates. This defamatory statement led to Ms. Rumph losing her nursing license, rendering her unemployable and financially destitute. (See Exh. 1) As such these facts are indisputable and leave no question that Plaintiff claim for defamation should move forward to trial.

*Id*. at 26–27. With the Complaint and summary judgment brief so lacking in factual details or argument, the Court can hardly analyze this claim. However, to the extent Rumph's defamation claim is based on Johnsons' statement (the only statement specifically identified by Rumph as defamatory) her claim fails because she cannot establish the first element of defamation, a false statement.

Rumph repeatedly denies in her Complaint and deposition testimony that she abused an inmate and that the video depicts her abuse of an inmate. However, she does not assert that the statements in Johnson's typed document—describing what the inmate reported, the individuals involved, when it was reported, etc.—is false. Rumph has not even attempted to dispute that Johnson received abuse allegations from an inmate or that her account of those allegations is false. Accordingly, because the only defamatory statement identified by Rumph is Johnson's statement and because Rumph has presented no evidence suggesting the details of that statement were false, Wexford is entitled to summary judgment on Rumph's defamation claim.

## IV.    RUMPH'S MOTION TO STRIKE EVIDENTIARY MATERIAL

Rumph has filed a motion (Doc. 26) asking the Court to strike evidence not produced by Wexford as part of its initial disclosures.[10] In the motion, Rumph asserts Wexford waited until her deposition in July 2023 to produce the ADOC emails but that "the most blatant failure" to disclose a document occurred at Johnson's deposition on January 3, 2024. *Id*. at 5. She asks that the emails and the statement be excluded.

Rule 37 of the Federal Rules of Civil Procedure "gives a trial court discretion to decide how best to respond to a litigant's failure to make a required disclosure under Rule 26," and "it may be an abuse of that discretion to exclude evidence where the failure to disclose is either substantially justified or harmless." *League of Women Voters of Fla., Inc. v. Lee*, No. 4:21-CV-186-MW-MAF, 2021 WL 7209349, at *2 (N.D. Fla. Dec. 6, 2021) (citing *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 593 (11th Cir. 2019) and *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1363 (11th Cir. 2008)). To support her motion, Rumph attaches excerpts of her deposition testimony complaining about Johnson and an excerpt of Johnson's testimony about preparing the statement, but

---

[10] Rumph also includes an "objection" in her summary judgment response asking the Court to "disregard and strike the declaration of Headley on the same legal basis as stated in Plaintiff's Motion." Doc. 38 at 13. Rumph asserts that she conducted "at least three depositions" but Wexford intentionally withheld Headley's affidavit from her. *Id*. She further asserts that she was 'severely disadvantaged" because she could have scheduled Headley's deposition if she had known about the affidavit. *Id*. First, phrased as an objection within her summary judgment response, Rumph's request is not properly before the Court. If Rumph wanted the Court to consider striking Headley's declaration, she should have included her request in a properly filed and supported motion. Second, Wexford was under no obligation to produce a copy of Warden Headley's December 2023 declaration to Rumph, which was apparently prepared in support of the summary judgment motion filed in January 2024. While the Court has not seen either party's initial disclosures or discovery responses, as the individual who issued the lockout notice that resulted in Rumph's termination, it was no secret that Warden Headley had knowledge or information relevant to this case. It was the responsibility of Rumph's counsel, not defense counsel, to depose Headley if he wanted to know how Headley would testify. That is why parties take depositions.

Rumph includes no details or analysis about the contents of the late-received evidence, its impact on her case, or how she was harmed.

With respect to the ADOC emails, Rumph was provided with the emails at her first deposition in July 2023 (*see* Doc. 26 at 2), but she was deposed a second time in November 2023 (*see* Doc. 29-11), giving her ample time to review the emails. With respect to Johnson's statement, Wexford states its failure to produce the statement sooner was due to inadvertence (Doc. 30 at 2), and it also attaches excerpts from Johnson's deposition showing how Rumph's counsel, after being given a copy of the evidence, declined to question Johnson about it.[11] Johnson's deposition continued, with Rumph's counsel questioning her about the ADOC emails, the inmate who was allegedly abused by Rumph, his possible drug use, whether officers came to assist Rumph on the day of the incident, whether the inmate was ever "combative," etc., but failing to ask even one question about the statement. Doc. 30-3 at 31–34 (Johnson Dep. at 122:18–132:12). The Court does not condone late disclosure of evidence, but it also does not condone the refusal to question a witness, when given an opportunity, on the basis of late disclosure alone. Finally, Wexford points out that Rumph and her counsel were provided with Warden Headley's lockout notice and the video in question before this lawsuit was filed. Thus, Rumph cannot claim she was unaware of the information described in Johnson's statement or in the ADOC emails before those documents were produced.[12]

---

[11] Rumph's counsel stated, "I am not going to participate in any deposition where you talk about a document because you had an obligation to produce it before the deposition, and you didn't do it." Doc. 30-3 at 27 (Johnson Dep. at 106:1–23).

[12] Another basis for finding that Rumph was not harmed by the late disclosure of Johnson's statement is that the statement, as discussed above, had no bearing on Wexford's decision to terminate Rumph. Johnson

Accordingly, because Rumph has failed to demonstrate she was harmed by Wexford's late disclosure of the ADOC emails or Johnson's statement, the Court concludes, in its discretion and pursuant to Rule 37, that her motion is due to be denied.[13]

## V.    CONCLUSION

For the reasons stated above, it is ORDERED as follows:

1.    Rumph's Motion to Strike Evidentiary Material (Doc. 26) is DENIED.

2.    Wexford's Motion for Summary Judgment (Doc. 28) is GRANTED.

A separate judgment will issue.

Done this 12th day of June, 2024.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

---

played no role in the decision, and it was only after receipt of Warden Headley's lockout notice that Wexford terminated Rumph.

[13] Interestingly, while moving to have Johnson's statement excluded, Rumph relies on the statement to support her defamation claim. It is the only evidence cited by Rumph as a "false" statement made by Wexford to the nursing board.